# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01158-COA

ST. DOMINIC AMBULATORY SURGERY CENTER, LLC          APPELLANT

v.

CAILTON SHAFFER, II, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF SHELIA SHAFFER, DECEASED AND WRONGFUL DEATH BENEFICIARIES OF SHELIA SHAFFER, DECEASED          APPELLEE/ CROSS-APPELLANT

v.

LORI MARSHALL, M.D.          CROSS-APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2019 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | MILDRED M. MORRIS TREMARCUS D'RAY KESHON ROSEMON TIMOTHY LEE SENSING |
| ATTORNEYS FOR APPELLEES: | JOE N. TATUM WHITMAN B. JOHNSON III LORRAINE WALTERS BOYKIN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 06/08/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., GREENLEE AND WESTBROOKS, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     Cailton Shaffer, individually and on behalf of the estate of Shelia Shaffer, sued Dr.

Lori Marshall, St. Dominic Ambulatory Surgery Center LLC (Surgery Center), and St.

Dominic Hospital in the Hinds County Circuit Court. Subsequently, on August 14, 2018, Dr. Marshall filed a motion to compel arbitration. On October 23, 2018, the Surgery Center moved to join Dr. Marshall's motion to compel arbitration. Cailton objected to arbitration, claiming that Shelia's signature on the arbitration agreement had been forged. After a hearing on the forgery allegation, the circuit court granted the motion to compel arbitration for the claims against Dr. Marshall but denied arbitration as to the Surgery Center's claims. From this judgment, the Surgery Center appeals, and Cailton cross-appeals. We affirm the circuit court's decision, finding that the circuit court did not err in granting the motion to compel arbitration of Dr. Marshall's claims, and denying the Surgery Center's joinder to compel arbitration.

## FACTS AND PROCEDURAL HISTORY

¶2.     On January 5, 2016, during a medical appointment, Shelia was presented with a Clinic-Physician-Patient Arbitration Agreement. The terms of the agreement provided that if a claim or controversy arose from Dr. Lori Marshall's medical services, those claims would be submitted to arbitration according to the Federal Arbitration Act (FAA). The agreement had to be signed by both the patient and a witness. Shelia signed the agreement on January 5, 2016. Dr. Marshall's business and office manager, Gwen Brister, signed as the witness.

¶3.     On August 9, 2017, Shelia underwent a cervical epidural steroid injection procedure. Dr. Marshall performed this procedure at St. Dominic Ambulatory Surgery Center. After being given the steroid injection, Shelia became apneic and unresponsive. Dr. Marshall

2

attempted to use a defibrillator machine provided by the Surgery Center, but the device malfunctioned, causing a delay in Dr. Marshall's efforts to resuscitate Shelia. On August 17, 2017, nine days after being admitted to St. Dominic Hospital's Intensive Care Unit, Shelia died.

¶4.     On June 29, 2018, Shelia's husband, Cailton Shaffer, brought a negligence action against Dr. Marshall, the Surgery Center, and St. Dominic Hospital. The complaint alleged that Dr. Marshall, the Surgery Center, and St. Dominic Hospital were negligent in the care and treatment of Shelia during and after the surgical procedure.

¶5.     On August 14, 2018, Dr. Marshall filed a motion to compel arbitration. The basis for this motion was the arbitration agreement executed during Shelia's January 5 appointment. Dr. Marshall argued that Cailton was bound by this agreement, as the agreement stated it was binding on Shelia's "heirs-at-law or personal representatives." On October 23, 2018, the Surgery Center sought to join Dr. Marshall's motion to compel arbitration.

¶6.     In response, Cailton contended that the arbitration agreement was invalid. He argued that cutting and pasting Shelia's signature to the agreement constituted forgery. On June 28, 2019, the circuit court held an evidentiary hearing on Dr. Marshall's motion to compel arbitration. In support of his position, Cailton offered the testimony of a handwriting expert, Robert Foley. Foley concluded that while Shelia's signature was likely genuine, the signature was not the original and had been "cut and pasted" to the arbitration agreement from another document in Dr. Marshall's possession.

3

¶7. Dr. Marshall and Brister testified on Dr. Marshall's behalf. Brister explained that while she did not personally remember Shelia, it was the policy of the clinic to give patients documents to sign upon checking in for their appointment. Although Brister did not physically watch Shelia sign the documents, she confirmed that she only signs the agreements after the patients returned the signed forms to her.

¶8. In order to determine if Shelia's signature had been forged or copied, Dr. Marshall engaged and submitted an affidavit from a computer-science expert, Dr. April Tanner. Dr. Tanner explained that to preserve Dr. Marshall's medical records, the arbitration agreement had been scanned into a cloud-based health records storage system. Dr. Tanner also explained that the software used did not allow modifications to a document after it was uploaded into the system. The software verified that the agreement had been scanned in on January 5, 2016.

¶9. After hearing expert testimony, it was uncontested that the signature on the agreement was indeed Shelia's. Finding that Cailton failed to meet his burden and prove that the signature had been fabricated or "cut and pasted," the circuit court entered an order granting Dr. Marshall's motion to compel arbitration and, in a separate order, denied the Surgery Center's request to arbitrate. The Surgery Center appeals and argues that the circuit court erred by not compelling Cailton to arbitrate his claims against the Surgery Center. Cailton cross-appealed arguing that the court erred in compelling arbitration on the claims against Dr. Marshall.

**DISCUSSION**

¶10. When determining whether a party may compel arbitration, the court applies a two-prong analysis. *Smith v. Express Check Advance of Miss. LLC*, 153 So. 3d 601, 606 (¶11) (Miss. 2014). The first prong is to determine whether the parties agreed to arbitrate the dispute, and second, if they did agree to arbitrate, "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Scruggs v. Wyatt*, 60 So. 3d 758, 766 (¶11) (Miss. 2011). "The first prong is two-fold in that the court considers whether there is a valid arbitration agreement and whether the parties' dispute is within the scope of the arbitration agreement." *Id*. The second prong requires the court to ask whether "any federal statute or policy renders the claims nonarbitrable." *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008). For ease of discussion, we address the issue on cross-appeal first.

**I.     Cailton's Cross-Appeal**

¶11. Mississippi law favors valid arbitration agreements. *B&S MS Holdings LLC v. Landrum*, 302 So. 3d 605, 609 (¶11) (Miss. 2020) (citing *Harrison Cnty. Com. Lot LLC v. H. Gordon Myrick Inc.*, 107 So. 3d 943, 949 (¶12) (Miss. 2013)). For this reason, we review the grant or denial of a motion to compel arbitration de novo. *Cmty. Bank of Miss. v. Stuckey*, 52 So. 3d 1179, 1181 (¶12) (Miss. 2010).

¶12. Cailton asserts that the circuit court erred in compelling arbitration on the claims against Dr. Marshall and should have invalidated Dr. Marshall's arbitration agreement.

5

Specifically, Cailton contends that Shelia's signature was "cut and pasted" from another document and placed on Dr. Marshall's arbitration agreement and is thus a forgery.

¶13.   If the court finds, as it did here, that a valid arbitration agreement exists and the allegations fall within the agreement's scope, the second prong of the test is triggered. The second prong asks "whether legal constraints external to the parties' agreement foreclosed arbitration . . . ." *Rogers-Dabbs Chevrolet-Hummer Inc. v. Blakeney*, 950 So. 2d 170, 173 (¶12) (Miss. 2007). "[S]tate contract defenses may invalidate the agreement to arbitrate as they would any other contractual provision." *Smith*, 153 So. 3d at 606 (¶11). An arbitration agreement may be invalidated under state contract law without offending the FAA if an applicable contract defense such as fraud, duress, or unconscionability is available. *E. Ford Inc. v. Taylor*, 826 So. 2d 709, 713 (¶10) (Miss. 2002). The party resisting arbitration carries the burden of proving that a contract defense is applicable. *Norwest Fin. Miss. Inc. v. McDonald*, 905 So. 2d 1187, 1193 (¶11) (Miss. 2005).

¶14.   Our supreme court is clear that "when . . . consider[ing] whether legal constraints exist external to the agreement, which might invalidate the arbitration provisions, the existence of fraud in the formation of the contract may be considered." *Blakeney*, 950 So. 2d at 177 (¶17) (citing *Cleveland v. Mann*, 942 So. 2d 108, 112 (¶9) (Miss. 2006)). By definition, forgery is a form of fraud and must be proven by clear and convincing evidence. *Cotton v. McConnell*, 435 So. 2d 683, 686 (Miss. 1983). Clear and convincing evidence is a high standard. *Id*.

¶15.   Cailton argues that no valid arbitration agreement existed since Shelia's signature

6

constituted forgery. In support of this defense, Cailton offered the opinion of a forensic document examiner and handwriting expert, Robert Foley. Foley compared Shelia's signature from the arbitration agreement to her other signatures found on several different personal documents. He testified that the signature on the agreement was

> originally a genuine signature appearing on an unknown document which was copied and affixed to the Q-1 questioned document via fabrication, i.e., by an electronic/digital/physical cut out process similar to what is causally known as a "cut and paste" method.

¶16. After examining the signed arbitration agreement and a blank arbitration form, Foley also determined that the documents were two different forms based on several inconsistencies. These discrepancies included toner depth and debris, different font designs and sizes, and various text deviations.

¶17. The expert's opinion, given during an evidentiary hearing on April 16, 2019, did not leave the court with a firm conviction that Shelia's signature was forged. The court found that there was no dispute that the signature was Shelia's. The circuit judge acknowledged the document's inconsistencies that showed that the form appeared to have been copied. However, the judge also pointed out that the appearance is expected based on the passage of time and whether the documents were produced in different years. On cross-examination, Foley admitted that in reaching his conclusion, he never saw the screenshot of the signed arbitration agreement found in Dr. Marshall's computer system. He also admitted that at the time he compared the blank arbitration agreement to that of Shelia's, he was unaware that the blank document was not created until 2018 and, thus, not the same document as Shelia's

7

signed arbitration agreement. Foley testified further that his opinion was not based on a degree of certainty but rather a degree of probability. Therefore, the court ruled that the discrepancies "in no way indicate[] to the court by a preponderance of the evidence or either by clear and convincing evidence that it had been altered or that it was a cut and paste job."

¶18.    Cailton argues that in compelling arbitration, the circuit court basically granted a summary judgment. In support of his argument, Cailton relies on *American Family Life Assurance Co. of Columbus v. Biles*, No. 3:10CV667TSL-FKB, 2011 WL 4014463, at *11 (S.D. Miss. Sept. 8, 2011). Therein, the court held that if the plaintiff's expert survived a *Daubert*[1] challenge, then summary judgment should be denied, and the parties should proceed to trial. However, in our present case, the court did not grant summary judgment but compelled arbitration because the party opposing arbitration failed to meet its burden. *Norwest Fin.*, 905 So. 2d at 1193 (¶11). The decision on compelling arbitration is for the court. *See* Federal Arbitration Act, 9 U.S.C. § 1-16. Our Court has held "[t]he right to compel arbitration is a legal question." *Citibank N.A. v. Stovall*, 211 So. 3d 700, 701 (¶6) (Miss. Ct. App. 2016) (quoting *Briovarx LLC v. Transcript Pharm. Inc.*, 163 So. 3d 311, 315 (¶14) (Miss. 2010)).

¶19.    Our caselaw is well-established that "[a] claim of fraud has to be clearly alleged, and . . . the facts and circumstances relied upon must be proved by clear and convincing evidence." *Frisby v. Warden*, 269 So. 3d 371, 376 (¶13) (Miss. Ct. App. 2018). Cailton failed

---

[1] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993).

to meet this burden. While the judge noted the inconsistences mentioned by Foley in the document, she also explained that "said testimony is overshadowed by Plaintiff['s] stipulation that the signature on the arbitration agreement is authentic." Furthermore, the judge heard testimony by Brister, who confirmed that she only signed the agreements after the patients returned the signed forms to her. The circuit court did not err by finding that the evidence of forgery did not rise to the level of clear and convincing. We affirm the circuit court's order granting Dr. Marshall's motion to compel arbitration.

## II.    The Surgery Center's Direct Appeal

¶20.    The Surgery Center asserts that the circuit court erred by denying its joinder in the motion to compel arbitration because Cailton's allegations against the Surgery Center touched the matters covered within its scope and were inextricably intertwined with those against Dr. Marshall. The Surgery Center also asserts that Cailton's allegations arose out of services rendered by Dr. Marshall and the Surgery Center and, therefore, fall within the arbitration agreement.

¶21.    "The grant or denial of a motion to compel arbitration is reviewed de novo." *E. Ford Inc.*, 826 So. 2d at 713 (¶9).

¶22.    Mississippi acknowledges the strong federal policy favoring arbitration. *Adams v. Greenpoint Credit LLC*, 943 So. 2d 703, 708 (¶14) (Miss. 2006). However, "a party will not be required to submit to arbitration any dispute which he has not agreed so to submit." *Pinnacle Trust Co. LLC v. McTaggart*, 152 So. 3d 1123, 1127 (¶14) (Miss. 2014). Despite

that, in rare circumstances, "a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency." *Miss. Care Ctr. of Greenville LLC v. Hinyub*, 975 So. 2d 211, 216 (¶11) (Miss. 2008) (quoting *Washington Mut. Fin. Group LLC v. Bailey*, 364 F.3d 260, 266 (5th Cir. 2004)).

¶23.    Whether this case presents one of those rare circumstances where arbitration may be compelled against a non-party turns solely on the first prong—whether the parties agreed to arbitrate the dispute. In other words, we are asked to determine whether Cailton has agreed to arbitration with a non-signatory, the Surgery Center. If this Court determines that the parties did not agree to arbitrate the dispute at issue, the analysis ends. *Caplin Enters. Inc. v. Arrington*, 145 So. 3d 608, 613 (¶8) (Miss. 2014). Otherwise, we continue our analysis by addressing the second prong—"whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Id*.

### i.    Whether the parties agreed to arbitrate the dispute.

¶24.    As discussed above, "[w]ho is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement." *Sherer*, 548 F.3d at 381 (citing *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003)). Where an agreement's terms fail to identify when a signatory may be compelled to arbitrate with a non-signatory, the court may explore various contract and agency law theories,

10

including equitable estoppel,[2] to determine the rights of a non-signatory. Here, the Surgery Center claims that this Court has no reason to explore these other theories since the arbitration agreement's language is broad and indicates "the Surgery Center's ability to join the arbitration."

¶25.    "Courts often characterize arbitration language as either broad or narrow." *MS Credit Ctr. Inc. v. Horton*, 926 So. 2d 167, 175 (¶24) (Miss. 2006). "Broad arbitration language governs disputes 'related to' or 'connected with' a contract, and narrow arbitration language requires arbitration of disputes that directly 'arise out of' a contract." *Id*. at 176 (¶24) (quoting *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998)). "Because broad arbitration language is capable of expansive reach, courts have held that 'it is only necessary that the dispute 'touch' matters covered by [the contract] to be arbitrable.'" *Id*. at (¶25) (quoting *Pennzoil*, 139 F.3d at 1068). The arbitration agreement given by Dr. Marshall's clinic, Premier Pain Care, states in relevant part:

> ["Patient"] engages **Premier Pain Care, P.C.** or employee thereof ("Clinic") and each Physician or Nurse Practitioner who renders medical care and services in conjunction with Patient's medical care. For and in partial consideration of the rendition of any and all present and future medical care and services, Patient agrees that in the event of any dispute, claim, or controversy *arising out of* the performance of medical services, including but not limited to, patient fees, informed consent, negligence or medical malpractice, between Patient (whether a minor or an adult) or the heirs-in-laws or personal representative of Patient, as in the case may be, and the *Clinic and*

---

[2] Other theories considered by the court include: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing or alter ego, and (5) third-party beneficiary. *Bridas*, 345 F.3d at 356.

11

*each Physician individually*, where the claim or the amount in controversy exceeds $5,000, such dispute or controversy shall be submitted to JAMS, or its successor, on an arbitration form for final and binding arbitration.

(Emphasis added).

¶26. According to the Surgery Center, the phrase "arising out of" as used in the above arbitration agreement is classified as a broad provision. *Pennzoil*, 139 F.3d at 1067. However, the above language does not include the "related to" type language but rather states, "arising out of the performance of medical services . . . ." That language is narrower and is limited to the "Clinic and each Physician individually." "[I]f the clause is 'narrow,' arbitration should not be compelled unless the court determines that the dispute falls within the clause." *Sealey v. Johanson*, 175 F. Supp. 3d 681, 686 (S.D. Miss. 2016) (quoting *Sedco Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co. (Pemex)*, 767 F.2d 1140, 1145 n.10 (5th Cir. 1985)).

¶27. Based on its language, the arbitration agreement is not so broad as to allow the Surgery Center, as a non-signatory, to compel arbitration. We now address whether Cailton's claims against the Surgery Center fall within the scope of the arbitration agreement.

### ii. Whether Cailton's claims against the Surgery Center fall within the scope of the arbitration agreement.

¶28. The Surgery Center argues that the allegations against it fall within the scope of the arbitration agreement. However, the agreement governs claims between the patient or patient's representative and the clinic, Premier Pain Care, and each of the clinic's physicians in their individual capacity.

12

¶29. Arbitration provisions are "contractual in nature," and therefore, "the general rule is that 'a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.'" *Scruggs*, 60 So. 3d at 767 (¶20) (citing *Qualcomm Inc. v. Am. Wireless License Group*, 980 So. 2d 261, 269 (¶15) (Miss. 2007)). Since Shelia was unaware that by signing the arbitration agreement she would agree to arbitrate any claims against the Surgery Center, a non-signatory not listed as an entity covered by the agreement, we cannot find that these claims fall within the scope of the arbitration agreement.

¶30. Given that Shelia did not agree to arbitrate with the Surgery Center, a non-signatory, our arbitration analysis concerning the Surgery Center ends here. The circuit court did not err by denying the Surgery Center's motion to compel arbitration.

### iii. Whether the "intertwined claims" test grants the Surgery Center standing to compel arbitration.

¶31. Since this Court disagrees with the Surgery Center's assertion regarding the broad language of the agreement "touching" Cailton's claims and thus allowing the center to compel arbitration, the Surgery Center asks this Court to consider alternative theories on which a non-signatory may compel arbitration.

¶32. The general rule that non-signatories may not be bound is not without several recognized exceptions. *Qualcomm Inc.*, 980 So. 2d at 269 (¶17). Our supreme court has acknowledged that "[s]tate law principles might provide for the arbitration of disputes between a non[-]signatory and a signatory to a contract, where there are allegations of substantially interdependent and concerted misconduct." *Sawyers v. Herrin-Gear Chevrolet*

13

*Co.*, 26 So. 3d 1026, 1038 (¶32) (Miss. 2010). "However, a third party who is a non-signatory to a contract should not be able to enforce an arbitration agreement, under the intertwined claims test, where there is no alter ego, parent/subsidiary, agency, or other form of close legal relationship alleged, and where the 'intertwined claims' do not depend on the agreement . . . ." *Id.* at 1038-39 (¶32). In other words, "a non-signatory may be able to enforce an arbitration agreement against a signatory where the non-signatory has a close legal relationship with a signatory of the agreement." *Qualcomm*, 980 So. 2d at 269 (¶17).

¶33.    The Surgery Center asserts that Cailton's allegations against the Surgery Center and Dr. Marshall involve "substantially interdependent and concerted misconduct" between Dr. Marshall (a signatory) and the Surgery Center (a non-signatory). The Surgery Center also claims that Cailton "clearly alleged that a close legal relationship exist[ed] between Dr. Marshall and the Surgery Center," and, therefore, the Surgery Center is entitled to compel arbitration. However, this issue is a question of contract interpretation.

¶34.    This Court must "accept the plain meaning of a contract as the intent of the parties if no ambiguity exists." *B.C. Rogers Poultry Inc. v. Wedgeworth*, 911 So. 2d 483, 487 (¶8) (Miss. 2005). "Contracts are solemn obligations and the Court must give them effect as written." *IP Timberlands Operating Co. Ltd. v. Denmiss Corp.*, 726 So. 2d 96, 108 (¶50) (Miss. 1998). Furthermore, we do "not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *Olshan Found. Repair Co. of Jackson LLC v. Moore*, 251 So. 3d

725, 728 (¶7) (Miss. 2018) (quoting *B.C. Rogers*, 911 So. 2d at 487 (¶8)).

¶35. Here, based on the contract's plain terms, it is clear that the parties did not agree to include the benefit of the arbitration agreement to non-signatories. The arbitration agreement's language does not include a single word or phrase that expresses an intent by the parties that the arbitration clause should include the Surgery Center. On the contrary, the plain language states otherwise.

¶36. The title of the arbitration agreement reads: "Clinic-Physician-Patient Arbitration Agreement." Directly above the title line is the heading "Premier Pain Care, P.C." On January 5, 2016, Dr. Marshall's clinic provided Shelia with the arbitration agreement, which she signed. Brister, in her capacity as Dr. Marshall's business and office manager, signed as the document's witness.

¶37. Furthermore, the contract reads that disputes may be submitted to arbitration by either of the parties. Since the Surgery Center was neither a party nor a signatory to the arbitration agreement, it is not entitled to arbitration. As stated above, this Court must "accept the plain meaning of a contract as the intent of the parties if no ambiguity exists." *B.C. Rogers*, 911 So. 2d at 487 (¶8).

¶38. For these reasons, the circuit court did not err by refusing to allow the Surgery Center's joinder compelling arbitration. The provision's plain language is clear as to who may seek arbitration.

**CONCLUSION**

¶39. For the foregoing reasons, we affirm the judgment of the circuit court.

¶40. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH, AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, P.J., NOT PARTICIPATING.**